Good morning, Your Honors. Chief Judge Carlton, and may it please the Court. Nick Pladsen on behalf of the Minnesota Attorney General. I appear in this case to ask the Court to reverse, vacate the preliminary injunction and remand to the District Court for further proceedings. This case should be reversed for three principal reasons. First, it relies on a principle under the Dormant Commerce Clause that has since been extracted or excised from the Dormant Commerce Clause theory as decided in Ross and Mallory by the Supreme Court in the 2023 term. As such, it provides no constitutional foundation for the ruling. Secondly, the Dormant Commerce Clause protects interstate commerce, but it does not protect the way individual firms or organizations choose to do business. And what the District Court's injunction does is validate a particular form or organization of distribution of goods across state lines, and that's error. Third, to the extent the District Court's injunction relies on the Act's penalty provision, which certainly concerned the Court, that was error, too, because the U.S. Supreme Court's decision in Pharma v. Walsh from 2003 dictates that a penalty provision, whether a law applies due to coercion or is purely voluntary, is irrelevant to the Dormant Commerce Clause analysis. I'd like to start back on the Ross and Mallory impacts on the Dormant Commerce Clause. And what makes clear, there's many parts to that decision, but I think the most clear part and the unanimous ruling, the first three sections of the decision, make clear that the Dormant Commerce Clause has two prongs. One, that there's discrimination against out-of-state commerce in favor of in-state commerce. This could be on businesses or it can be on consumers. There's no discrimination here in this case. It's not alleged by the appellees, and it's not implicit in the operation of the Act. Secondly, a court may find that an Act has impermissible discriminatory effects through PIKE balancing analysis or that it clogs up the arteries of commerce. Those are the two avenues that you have for the Dormant Commerce Clause. And what Ross and Mallory really refine is the fact that this so-called extraterritoriality prong no longer exists or at least no longer resides in the Dormant Commerce Clause. That's not to say it doesn't exist elsewhere in the Constitution. Certainly, certainly Justice Gorsuch suggested that, as did Justice Kavanaugh in the Ross decision. It could be a due process. It could be other provisions of the Constitution, but it's not in the Dormant Commerce Clause. And Ross recognized that the extraterritoriality principle, whether it was the extraterritorial effects concepts or this direct control of wholly out-of-state commerce, was really a limitless principle that empowered, that gave the judiciary too much power to decide when democratically adopted state laws were extraterritorial. But the Dormant Commerce Clause is not an all-purpose tool for use whenever a state law impacts something outside of its borders. Instead, it operates for those specific purposes. And in doing so, the Supreme Court confined the sort of trilogy of extraterritoriality cases, the Baldwin, Brown-Foreman, and Healy decisions, to really discrimination cases. That's what they were about because they discriminated against out-of-state commerce in favor of in-state commerce. Now that leaves the Edgar case, Edgar v. Mighty, which Apolli relies on to say that this Constitution still restricts an ability of states to wholly control out-of-state commerce. And that may be, but it's not in the Dormant Commerce Clause anymore. And I don't think the Court said where it belongs or where it now lives, but I think it was clear in footnote one that Justice Gorsuch was saying for the Court that this is not a principle that should fit within the Dormant Commerce Clause. And that's why the district court erred, because it rested its determination that this principle outlined in Edgar is the Dormant . . . Do you think Ross completely eliminated extraterritorial considerations? As I read this statement in there, it sort of rejects a per se rule that would stop any extraterritorial effect. Aren't those different things? Well, I think they are, but I think where you could see that, it would be in the Pike Balancing Equation, where you would balance, you know, what's the impact here on out-of-state commerce? Is it going to fall much more heavily on out-of-state commerce and reveal essentially a implicit discrimination against out-of-state entities? I don't think it necessarily said out-of-state effects don't matter. I think it said just because you have out-of-state effects, it doesn't necessarily . . . Per se. Not per se, right? So we have to do a more nuanced analysis of what's at issue. But the fact of the matter is, the Court erred as well because in its description of the law, it concluded that this Act regulates wholly out-of-state commerce, directly regulates wholly out-of-state commerce. And I think a plain reading of the Act just does not reveal that. That's just wrong. The Act itself only applies to manufacturers who've obtained Minnesota licenses to manufacture drugs in the state of Minnesota. They've all come here, obtained a license, agreed to follow Minnesota's regulatory scheme for pharmaceutical drugs, and even though they're not located here, or they might be manufacturing elsewhere, send their drugs into Minnesota. And the Act is not actually violated until one of their drugs comes into Minnesota, assuming it has been priced at an increase barred by the formula under the Act. Now that doesn't . . . that's not extraterritorial wholly extraterritorial. It only gets violated in the state of Minnesota when it comes from a license holder. Now we could bar drugs entirely from the state of Minnesota. In fact, we do. Unless you hold a license to manufacture pharmaceuticals, you can't send your drugs into the state of Minnesota. And I think the greater there includes the lesser, that we can impose conditions on the drugs that come into our borders. Now even if I'm wrong about Ross and its impact on the extraterritoriality piece, I think the Brown-Forman case shows, you know, their description of what extraterritorial control means really illustrates this. And in Brown-Forman, New York sought to initiate license revocation proceedings against a liquor distiller because they were engaged in a certain rebate scheme outside of the state, not in New York. And that was exactly the type of control on out-of-state conduct that was prohibited under the Act. But here, there's no out-of-state conduct that lacks a connection or an in-state action here. And that's because the drug has to come into the state of Minnesota. Further, I think highlighting the extraterritoriality problems and the problems with that doctrine and the fact that there's really no limiting principle here. Almost every state, if not every state, has a pharmaceutical regulation scheme. And there are pharmaceutical manufacturers across the country. And if we were to allow this case to proceed on this ruling and this there's no logical reason why the manufacturers couldn't come back next week with a lawsuit challenging state regulation of the ingredients that they purchase. The out-of-state manufacturers purchase ingredients to compound their drugs, to put together the active pharmaceutical ingredients. Those are transactions that are out-of-state. But Minnesota has a police power right to regulate the quality, content, and quantity of drugs that come into its borders. And there's no principled reason that the logic that underlies the Court's decision here would not also apply to its ability to regulate the content or the quality of those drugs that come into Minnesota. Now secondly, and I think the second error of the district court, is that they essentially adopted or agreed with the appellees and their contention that this is just the way they do business and this would be too hard. Most of their drugs, to be sure, are sold and made and distributed outside of Minnesota's borders. But not all of them are. And while appellees do not have any in-state businesses or in-state locations, there to be sure are Minnesota manufacturers of generic drugs. So this is not as if there aren't any. But even if there weren't, the Supreme Court decisions in the Farmer v. Walsh case where no manufacturers were in the state of Maine still did not violate the Dormant Commerce Clause. Now here, the only reason that this sort of hypothetical that frames the injunction happens is that you've got an out-of-state manufacturer setting a price between an out-of-state distributor. The only reason that happens and is outside the alleged scope of Minnesota's police powers because there's two voluntary choices made by actors in the market. First, an out-of-state manufacturer chooses to use an out-of-state distributor. They don't have to do that. Certainly, Sandos, the only manufacturer in the record, in their affidavit at Joint Appendix 48, paragraph 4, indicates that they do make direct sales into the state of Minnesota. So it's certainly possible. But secondly, the other choice that is not required by the act or prescribed by the act is that these manufacturers choose distributors who refuse to do state-specific pricing or allow for state-specific pricing. And that is not a neither of those choices are a necessary byproduct to the act itself, but from the actors in the market. And what the Exxon decision from the Supreme Court, Exxon v. Governor of Maryland, says specifically is that these, the way the market operates or that particular firms choose to do business in this way is not a cognizable Dormant Commerce Clause concern. We're concerned about the market more largely and with the refinement from Ross, you know, out-of-state versus out-of-state, the discrimination between that. This is, again, not an all-purpose tool to govern all regulations. But we're not concerned about how particular firms do business. I think even this Court's decision in Cotto-Waxo reflects that understanding. In that case, Minnesota flatly barred a particular product and the manufacturer there was out-of-state and basically was saying, you know, this is going to change the way we do distribution across the country. This is going to be a big impact. And this Court said, that doesn't matter. That's really not cognizable. It may have a negative effect on your business, but that is not a cognizable Dormant Commerce Clause concern. Now these, another case that I think is really on point here is the Online Merchants Guild v. Cameron price gouging law from Kentucky in 2022. Basically, there the Kentucky Attorney General was seeking to enforce price gouging law against online merchants. The online merchants wanted to sell and distribute through Amazon. Understandably so. Amazon refused to do state-specific pricing that could comply with the law. And the merchants contended that they, that the law violated the Dormant Commerce Clause because, hey, you know, our distribution methods here don't allow for us effectively to comply with the law. And therefore, you guys are regulating extraterritorial conduct. But the Sixth Circuit there said that doesn't really matter because it's not a choice of the state to, you don't have to use Amazon while you may want to. That's your choice. And it's not, you know, it's Amazon's choice not to do state-specific distribution. And so I think, I think that's instructive here because that's exactly what they're saying. Like, hey, you guys don't understand how our industry operates. And fair enough. But that's not a Dormant Commerce Clause concern. And so I think this, the narrowness of the injunction and its basis on the Dormant Commerce Clause and its extraterritoriality provision warrant remand for further proceedings. Now, this case is not over. No matter what this Court rules, we're going back and they still have a due process claim. They still have a pike balancing claim. So we're going to still be fighting out these issues further. And maybe there's appropriate ways that this Court or that this law fits into either one of those claims. Certainly, we're going to defend it. But to the extent that that is a concern at all for this Court, we've got further proceedings to develop the record. Now, finally, I just want to touch on the penalty provision in the pharmaceutical versus Pharma versus Walsh case from 2003. The Court there, again, just said that the penalty, the facts, there was a sort of either, in that case, the manufacturers had to either agree to a rebate scheme in the State of Maine or their drugs would be subject to prior authorization in the State. And so it was an either or. And the manufacturers said, this is really not a choice at all. This is coercion. And the Supreme Court said, that's not a Dormant Commerce Clause concern. Certainly, you don't like that. And certainly, we can disagree about whether it's good policy. But it doesn't matter for the Dormant Commerce Clause analysis whether the law applies to voluntary decisions or as a product of coercion. Any questions? I'll remain there for rebuttal. Very well. Thank you for your argument. Mr. Jay, we'll hear from you. Good morning, Your Honors. May it please the Court, William Jay for AAM. There's a lot I'd like to respond to from Mr. Platson's argument, but I just want to note at the threshold that a number of the things in the argument, although they may be in the reply brief or not in the opening brief, and the question you asked, Judge Grunder, got the exact opposite answer to the one that the State gave in the district court. So the position in the reply — it doesn't arrive until the reply brief that Ross has overturned this Court's binding precedent in Stachynsky, a precedent that my friend didn't address at all in the opening argument. And we think that the question before the Court is, if Stachynsky is still good law, can this law survive? And it cannot. The argument that the State made below was that the regulatory framework that governs the distribution of pharmaceuticals in Minnesota gives the State essentially leverage or a regulatory hook to regulate the prices that a licensed manufacturer charges out of State. There are a couple of things wrong with that. First, I just want to disagree with one of the premises that Mr. Platson had in his argument. There's nothing in this statute that ties this price control to the license that the manufacturer may or may not have in the State. That is not built into this statute. But even if we set that aside, the transaction that is regulated by this statute is a transaction by a manufacturer. Now, if the manufacturer sells directly into Minnesota, this injunction does not bar that. We're not arguing that the Dormant Commerce Clause prevents Minnesota from regulating that transaction. What we are arguing is that where the State of Minnesota says we are going to regulate a transaction between, for example, a Pennsylvania manufacturer and a New Jersey wholesaler, that's not an argument about how the pharmaceutical market is structured or anything like that. It is a direct regulation of a transaction in another State. And if you look at the remedy — if you look at the injunction, it is not just that that is the only thing that is enjoined, only as applied to transactions out of State, entirely out-of-State transactions. That's not narrow, though, is it? I mean, that affects a lot of transactions. Well, it does, because the generic manufacturers that are regulated by this statute, that are its sole target, are all located outside Minnesota. I'm not sure what Mr. Platson was referring to when he said that that's not the case. I think he was just saying there might be some generic manufacturers in Minnesota. I think he did say that, but he hasn't pointed to any that are licensed by the State, nor does the Trade Association for the Generic Industry know of any. Not that that's what this turns upon, but your question was, isn't that a lot of transactions? Yeah. All the people involved in this case are out-of-State people, companies. Right. And respectfully, the State chose to regulate the out-of-State manufacturers rather than regulate the price charged in Minnesota, I think precisely because the State wants to kind of have its cake and eat it, too. The State doesn't want to bar the pharmaceuticals from the State. So Mr. Platson's allusion to the power to bar defective or dangerous articles from the State, we're not contesting that power, but that is not the power that the State is relying on here. They're arguing that the price charged upstream is unlawful and that, therefore, when the drug makes its way to Minnesota, not through the choice of the manufacturer. Manufacturer can't control whether it gets here, and it doesn't matter what price is charged in Minnesota. If you look at the sort of nexus provision of the Act, it's distributed. It's in the passive voice. It doesn't say by whom, and it doesn't matter whether the, whether a customer or a consumer pays an excessive price, a reasonable price, or no price at all. Any dispensing of the product in Minnesota is enough to trigger the Act's penalty provision. And the, I think the remedy provision of the Act really kind of puts a fine point on this. If you look at Section 25-3A2, a Minnesota court can order a manufacturer to change its price. Now, remember, this Act only applies to manufacturers. The only price regulation that that injunction is going to be doing is to order an out-of-State manufacturer to change the prices that it charges in out-of-State transactions to out-of-State wholesalers. And that, it's a very clear violation of the principle that one State can't regulate transactions in another without violating the Dormant Commerce Clause. Now, it's... And why are they doing it this way? They don't want to regulate the price in the State because they don't want to affect the end seller? They want to affect somebody further back in the chain? I think that that's part of it. I think that they're not relying on the idea that they want to bar articles from the State because they don't actually want generic drugs, which are the primary means by which pharmaceutical prices are lowered in this country, typically to bar from the State. They don't want to bar them, but you said they could just regulate the price charged in Minnesota. And I think one reason that they've chosen not to do that, other than the one that your question asked about, which is just sort of they've chosen to target out-of-State manufacturers rather than threaten in-State pharmacists with massive penalties and injunctions. Well, and losing money because they have to pay the... Go ahead. The in-State pharmacist is shielded from this statute completely. And I think that they've set it up that way because they want to affect the price charged upstream. I think they want to affect the price for the entire country, if they can. And they don't want to regulate the price kind of at the cash register in the pharmacy, in part because of the role of insurance, that the price that a consumer pays at the pharmacy may well be, you know, a $10 or $15 copay. The beneficiary of a price control at the pharmacy might well be a $10 or a $15 copay or a third-party payor or something like that. So they've chosen to structure it this way so that they can target the manufacturer to wholesaler transaction and basically order the entire industry that if you don't comply with Minnesota law, essentially in all of your transactions, you're going to be subject to this massive disgorgement and these very strict penalties. Now I understand that their answer to that is, well, you could just structure your transactions to avoid Minnesota entirely. We have declarations that say that's not possible. And the other state hasn't... Sorry, the other side hasn't controverted that at all. And I think you can't beat something with nothing. But even if that were not the case, even if we didn't have this declaration testimony about that point, I think the point is that the Seventh Circuit in the Legato Vapors case referred to this as the sort of impregnable or foolproof contract. It recognizes that even if a manufacturer puts the most craftily and artfully worded terms into its contract with a wholesaler, that's no guarantee that the product will not eventually make its way into the State of Minnesota. You can't control what eventually happens to your product, especially when you sell to a nationwide business. If you sell to Walgreens or CVS or, for that matter, the Mayo Clinic, if you sell to a location outside Minnesota, you have no control about whether the products that you've sold will wind up being shifted around to the different locations within the country and dispensed in Minnesota. That's exactly the point that the district court pointed out, that this penalizes manufacturers for decisions they cannot make. And I think the penalty for withdrawing from Minnesota, that just puts the capstone on it, because that just makes clear that the State is not concerned with protecting consumers at the cash register in the pharmacy, because the penalty provision applies. Even if you consciously want to make a decision to avoid Minnesota and you pull all your products out of Minnesota, you pay a mandatory $500,000 penalty per product. So I think that underscores that this is not the State trying to regulate in the State. So will you agree post-Ross that extraterritorial effect alone doesn't get you there? Yes. Okay. Then can you articulate for me what is, what exact, how does this discriminate against interstate commerce? It is a direct regulation of interstate commerce, and so the only transactions that are subject to the penalty provisions are those that occur in interstate commerce. In other words, it doesn't regulate domestic commerce within Minnesota at all. And any transaction... So normally, it's phrased, I think, in terms of, hey, it benefits certain manufacturers in Minnesota to the detriment of manufacturers outside of Minnesota, or it benefits patients or something. Can you give me that kind of a discriminatory analysis? Let me give you a two-step answer to that. And just the first is to observe, I think, just as Justice Barrett observed in her concurrence in Ross, that sometimes the doctrinal strands of the Dormant Commerce Clause analysis look at where there's smoke, there's fire, right? So in other words, pike balancing, for example, doesn't look at whether there's discrimination on its face. It has its balancing test, but what it is getting at is discrimination, kind of, you know, concealed discrimination. I don't think there's any difference between that and the same, the strand that we're relying on here, which is the strand that says direct regulation of transactions in other states. That likely is intending to favor in-state interests over out-of-state interests. It's not required to be shown on the face of the statute. I do think that the facts of this case in which the generic industry outside Minnesota is targeted and in-state actors, whether they're pharmacists or wholesalers or whoever, are shielded, I think that that's enough smoke to allow the Court to say that its clear precedent and the Supreme Court's precedent on direct regulation isn't lifted by the discussion of discrimination or favoritism in Ross or protectionism. I mean, Ross, I think, took pains to distinguish Edgar, to say that it wasn't disturbing Edgar, and the principle in Edgar is the foundation stone of our argument here. And Edgar didn't deal with discrimination. It dealt with the state trying to regulate transactions it had no business regulating. Do you think there's still some vitality to Edgar and the proposition developed there independent of pike balancing? Yes. Edgar is not a pike balancing case. Right, because they're the two separate holdings. I thought you were saying that the two were effectively doing the same thing, but they're really not. You're saying you might pass pike balancing but still lose under pure extraterritorial regulation under your theory, right? Yeah, and I was trying to refer to, to answer Judge Gruner's question by saying, which was about sort of where's the discrimination or protectionism here. You were just saying that neither one of them involves discrimination on the face. Exactly. But you think you could pass pike balancing but still be unconstitutional for directly regulating something extraterritorially? Yes, and I think, here's how I'd put that. Like, I don't think that you have to make the factual showing that goes into a pike balancing analysis in order to show that a direct regulation is unconstitutional. The one requires more fact development. The other is the Supreme Court has never had any trouble holding that a direct regulation is just unconstitutional. The same thing that this court did in Stachynsky, in which the state was trying to leverage the fact that the, the bullion dealers were registered in Minnesota or might be domiciled in Minnesota in some way or that Minnesotans were involved in the transaction. And this court said, right, that you don't, it doesn't allow Minnesota to pin its law to those people wherever they travel. It wasn't necessary to go through a pike balancing analysis to weigh the benefits and burdens of what, you know, of Minnesota's law in order to say that that's, that was not permissible under the Dormant Commerce Clause. Just a quick word about Farmer v. Walsh, a case that surfaces, I think, for the first time in the reply brief, but that was important to Mr. Plattson today. I just want to point the Court to page 669 of the Supreme Court's decision, which points out that that statute did not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. It simply was not a case involving either direct regulation or the effects-type argument that wound up being disapproved by the Supreme Court in Ross. I don't think that it can help the State get out of its pickle here. And in particular, I do not see how it can help the penalty for withdrawing from the State because, you know, to the extent that the State has a theme, it's that, you know, you choose not to avail yourself of the privilege of doing business in Minnesota. But what exactly does the statute say about a penalty for withdrawing from the State? Right. So that is in section 26, which is on the, in the addendum at page 31. Okay. Right. It says, The Attorney General shall assess a penalty of $500,000 on any manufacturer of a generic or off-patent drug the Attorney General determines has failed to comply with the requirements of this section. Okay. What does this section say? A manufacturer of a generic or off-patent drug is prohibited from withdrawing that drug from sale or distribution within this State for the purposes of avoiding the prohibition on excessive price increases under section 842. So... Your point is, therefore, you can't really contract around this because you'll be hit with a $500,000 penalty? Exactly. The transaction is regulated by Minnesota, whether it is a decision to pull out of Minnesota or to package your drugs for Minnesota or to just package your drugs for the nationwide market. Either way, Minnesota wants to have something to say about it and is penalizing manufacturers if their transaction in New Jersey or Pennsylvania or wherever doesn't comply with the floor that Minnesota wants to set for the whole country. Unless the Court has any further questions. Very well. Thank you for your argument. Thank you, Your Honors. Will he rebuttal? Yes, sir. With respect to this idea that they can't control, if, let's say, a manufacturer does not intend to have their drug come here, they excessively price it and it winds up in Minnesota, they've got a due process claim waiting for us at the district court or maybe there's an as-applied challenge to that in the future. But that's not a Dormant Commerce Clause issue. And, again, the only thing before this Court is the existence of this direct control line of cases under the Dormant Commerce Clause. And it's my argument today that this is not a Dormant Commerce Clause concept. It's inherent in the Constitution, but not for the Dormant Commerce Clause. And at a minimum, this Court should clarify for everyone that the Dormant Commerce Clause does not contain this provision. I mean, if it was still in the Dormant Commerce Clause, wouldn't Justice Alito have included it in the two prongs he listed in Mallory, saying we refined our Dormant Commerce Clause and here's the way you do it. One, discrimination. Two, pike balancing. End of story. There might be other clauses and further development of where this concept goes. What case do you think we should cite? You think we should cite Mallory and say the Supreme Court has done away with it? Well, no, but this is how Justice Alito describes Dormant. What case? Mallory v. Norfolk Southern. No, I know. Right. I'm sorry. I know what that case is, but I would say what case you want us to cite to say the extraterritoriality doctrine is defunct. Well, it's not. I'm just asking you to say it's not in the Dormant Commerce Clause anymore. I think what. Based on what? Based on a footnote.  Based on a footnote in a plurality opinion that says some have questioned whether No, that's not the plurality. That's the majority and that's the unanimous part of Ross, to be clear. Pardon me? That's the majority or the unanimous part of Ross. Ross gets hopelessly fractured the further you go, but that part is good.  Still only says some have questioned whether. Right. And I think what they were simply. I'm sorry. I'm not going to. Either way, Edgar doesn't support the people here. Right. And I think. You really think that? I think he's just saying, look, we don't have to decide where it belongs today. It's not here. That's the next case. Okay. I see my time is up. Thank you. Very well.